**A**

B 104—Summons without Notice, Blank Cham.
Formerly for Sale/Second Service. 12 pt. type. 4-94

JULIUS BLUMBERG, INC.
PUBLISHER, NYC 10013

SUPREME COURT : STATE OF NEW YORK
COUNTY OF SUFFOLK

PATIENT ACCESS SOLUTIONS, INC.,

                                    Plaintiff(s)

                against

MDWerks, Inc., Xeni Financial Services, Corp., Digital
Pen Applications, Inc., Digital Pen Systems, Inc. and
Howard Katz,

                                    Defendant(s)

Index No. 10-08325
Date purchased  03/25/10

Plaintiff(s) designate(s)  Suffolk

County as the place of trial.

The basis of the venue is Plaintiff's
residence and the parties' con-
tractual terms

**Summons**

Plaintiff(s) reside(s) at
245 Marcus Boulevard, Hauppauge,
New York
County of  Suffolk

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of
your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's
Attorney(s) within  20    days after the service of this summons, exclusive of the day of service (or within 30
days after the service is complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated, Mineola, NY
        March 25, 2010

Attorney(s) for Plaintiff

Office and Post Office Address

Defendant's address:
1) MDWerks, Inc.
   1020 N.W. 6th Street, Ste I
   Deerfield Beach, FL 33442

2) Digital Pen Applications, Inc.
   1020 N.W. 6th Street, Ste I
   Deerfield Beach, FL 33442

4) Howard Katz, c/o
   MDWerks, Inc.
   1020 N.W. 6th Street, Ste I
   Deerfield Beach, FL 33442

2) Xeni Financial Services,
   1020 N.W. 6th St, Ste I
   Deerfield Beach, FL
   33442

4) Digital Pen Systems, Inc.
   7390 South Creek Road, Ste. 204
   Sandy, Utah 84093

1539 Franklin Avenue, Ste. 201
Mineola, NY 11501
516 747-1210

FILED
MAR 25 AM 11:03
PASCALE
COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

---------------------------------------------------------x

PATIENT ACCESS SOLUTIONS, INC.,

                              Plaintiff,         COMPLAINT

      -against-                       Index No. 10-08325

MDWerks, INC., XENI FINANCIAL SERVICES
CORP., DIGITAL PEN APPLICATIONS, INC.,
DIGITAL PEN SYSTEMS, INC. and HOWARD KATZ,

                             Defendants.

---------------------------------------------------------x

The plaintiff, PATIENT ACCESS SOLUTIONS, INC., complaining of the defendants, by its attorney, DAVID H. LEDGIN, Esq., respectfully alleges as follows:

### PRELIMINARY STATEMENT

1. The plaintiff, PATIENT ACCESS SOLUTIONS, INC. (hereinafter "PAS") is a Nevada corporation authorized to do business in the State of New York and having its principal place of business at 245 Marcus Boulevard, Hauppauge, NY.

2. The defendant, MDWerks, Inc. (hereinafter "MDW"), upon information and belief, is a Delaware corporation authorized to do business in the State of New York, having its principal place of business at 1020 N.W. 6th Street, Suite I, Deerfield Beach, Florida.

3. Upon information and belief, the defendant, XENI FINANCIAL SERVICES CORP., (hereinafter "XENI") is a Florida corporation having its principal place of business at 1020 N.W. 6th Street, Suite I, Deerfield Beach, Florida and is a wholly-owned subsidiary of MDW.

4. Upon information and belief, the defendant, DIGITAL PEN APPLICATIONS, INC. (hereinafter "DPA") is a Florida corporation having its principal place of business at 1020 N.W. 6th Street, Suite I, Deerfield Beach, Florida and is a wholly-owned subsidiary of MDW.

1

5. Upon information and belief, the defendant, DIGITAL PEN SYSTEMS, INC. (hereinafter "DPS"), is a Utah corporation having its principal place of business at 7390 South Creek Road, Suite 204, Sandy, Utah 84093.

6. PAS is engaged in the business of, *inter alia*, providing to health care providers and hospitals point of service terminals and web portals used to verify patient eligibility, process claims and verify health insurance coverage and uses digital pen technology to do the same.

7. MDW is engaged in the business of providing medical billing services to health care providers and is a publicly traded company.

8. XENI is engaged in the business of providing financing for medical receivables and to health industry providers and suppliers.

9. DPS is engaged in the business of developing and marketing a digital pen and paper technology, owned and created by Anoto Group, based in Sweden.

10. Upon information and belief, the defendant, HOWARD KATZ (hereinafter "KATZ"), is an employee and/or officer, director or shareholder of both MDW and XENI and/or a consultant for each. In addition, the defendant, KATZ, is the former chief executive officer of the defendant, MDW and continues to be involved in the ongoing business and legal affairs of MDW, appearances to the contrary notwithstanding.

11. In addition to the above, the defendant, KATZ, has acted and been engaged by PAS as a consultant allegedly for its benefit.

12. This Court has jurisdiction over the defendants, MDW, XENI, DPA and DPS by virtue of written agreement and consent of the parties.

13. This Court has jurisdiction over the defendant, KATZ, by virtue of CPLR Sections 302 (a)(1)(2)(3)(i) and (ii).

2

AS AND FOR A FIRST CAUSE OF ACTION
AGAINST MDWerks, INC.

14.    The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 13 above as if more fully set forth herein.

15.    On or about August 18, 2008, the plaintiff and defendant MDW, pursuant to a written "Licensing and Sales Agreement" (copy annexed hereto as Exhibit A and made a part hereof) entered into a contract wherein and whereby MDW was to market and sell to third party customers PAS products and services.

16.    Said agreement provided, *inter alia*, that

"...1(b) Contractor [MDW] warrants that DPAS Pen System, a product of PATIENT ACCESS SOLUTIONS, INC. is its only product in the area of health care digital pen technology and will represent no other similar product or service during the term of this Agreement.

5(h) [MDW will] Purchase digital pens directly from PASHealth for use by salespeople at a fixed price of $350.00...

7.    Ownership- All customers and customer lists generated under this Agreement shall be the mutual property of PASHealth and Contractor. All rights and title to DPAS Digital Pen System and all related software programs and documentation, the PASHealth name and logo, the PASHealth and PASHealth domain names, all forms, contracts, brochures and all related promotional, sales and training materials belong solely to PASHealth.

8.    Non-Compete- Contractor, [MDW] its officers, employees and affiliates, agree that they will not solicit directly or indirectly or initiate a direct contact, to or with, any customers, potential customers or business contacts of PASHealth or DPAS Digital Pen System during the term of this agreement and for a period of one (1) year after the termination of this agreement, in regards to products similar in nature to those offered by PASHealth.

9.    Confidentiality- During the term of this contract and for a period of five (5) years after the termination of this Agreement, Contractor agrees not to disclose or use for its own benefit or for the benefit of any third party any confidential information disclosed to it by PASHealth.  This shall include, but not be limited to, personnel and product information, know-how, customer list, formulas or other data, excluding information that is in the

3

public domain at the time or termination or that becomes part of the public domain from sources other than the Contractor during the succeeding five (5) years.

17. As a result of this agreement MDW issued a press release (copy annexed hereto as Exhibit B and made a part hereof) on or about March 11, 2009, that stated:

> "MDWerks, Inc. and its wholly owned subsidiary, XENI PATIENT ACCESS SOLUTIONS, INC. (XPAS) announced today that the Company has entered the digital pen and paper marketplace through the sale of the proprietary "D-PAS" digital pen and the related software and services. The company has a nationwide sublicense agreement and marketing agreement with New York based PATIENT ACCESS SOLUTIONS, INC. (PAS) from whom the pens and related software and services will be attained. (Emphasis supplied) ..."

18. Pursuant to and in reliance upon said agreement PAS proceeded to train and inform MDW's personnel in PAS' products and services, disclose to it information of a proprietary and confidential nature and disclose its customers to MDW, as intended under said agreement.

19. As a result of such training and education of MDW's personnel, MDW entered the marketplace to begin marketing PAS products and services, ostensibly on PAS' behalf, as intended under the parties' subject contract.

20. MDW thereafter, in or about April of 2009 and continuing to the present time, breached and violated the above-aforementioned Licensing and Sales agreement in that it:

> i) set up subsidiaries wholly owned by MDWerks such as DIGITAL PEN APPLICATIONS, INC. to market PAS products and services without PAS' knowledge and consent;
>
> ii) negotiated and entered into agreements with PAS vendors and suppliers without PAS' knowledge and consent, appropriating PAS' products and services;
>
> iii) negotiated directly with PAS customers to sell and/or lease its own digital pen technology completely circumventing and bypassing PAS;
>
> iv) negotiated contracts with third parties who are PAS customers, a fact known to MDW, using its wholly owned subsidiary, Digital Pen Application, Inc. without PAS knowledge and consent;

4

v) disclosed to third parties information and technology of a confidential and proprietary nature;

vi) misrepresented and continues to misrepresent its relationship with PAS to third parties in the marketplace so as to cause confusion and inhibit PAS sales, while promoting MDW's own subsidiary's direct sales to said third parties;

vii) disparaged PAS to third parties in the marketplace so as to inhibit, disrupt and damage PAS sales.

21.  As a natural and intended consequence of MDW's aforedescribed breaches of contract, PAS has been damaged in the amount of $2,000,000.00.

AS AND FOR A SECOND CAUSE OF ACTION
AGAINST MDWorks, INC. and DIGITAL
PEN APPLICATIONS, INC.

22.  The plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 21 above as if more fully set forth herein.

23.  As a direct result of the violations and continuing violations of MDW and its wholly owned subsidiary, DPA as stated above, the plaintiff, PAS, continues to be damaged on a regular basis.

24.  The defendants, MDW and its wholly-owned subsidiary, DPA continues to appropriate PAS technology, contact PAS customers, misrepresent PAS' products and services and the status of the company, damaging PAS and tortiously interfering with its sales.

25.  All of the above continues on a present basis in violation of the written License and Sales Agreement referred to above.

26.  All of the above serves to irreparably harm the plaintiff, and MDW and DPA have no legitimate defense to their aforedescribed breaches of contract.

27.  As such, plaintiff demands a judgment against MDW and DPA permanently restraining them from violating the aforesaid License and Sales Agreement by contacting

5

customers of PAS and marketing PAS' products and services such as the digital pen technology.

28. Plaintiff has no adequate remedy at law.

AS AND FOR A THIRD CAUSE OF ACTION
AGAINST DIGITAL PEN SYSTEM, INC.

29. The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 28 above as if more fully set forth herein.

30. On or about September 30, 2008, the plaintiff and the defendant, DIGITAL PEN SYSTEMS (DPS) entered into a contract (copy annexed hereto as Exhibit C and made a part hereof) wherein and whereby plaintiff agreed to market DPS's digital pen and paper technology to health care providers.

31. Said agreement provided, *inter alia*:

"1. PAS and DPS will jointly market their respective technologies to health care providers and hospitals and non-health care providers, on an exclusive basis. (Emphasis supplied) . . .

5. During the term of this contract and for a period of 5 years after the termination of this Agreement, the parties agree not to disclose or use for their own benefit or for the benefit of any third party any confidential information disclosed to it by each other. This shall include, but not be limited to, products, models, designs, equipment, pricing policies, marketing strategies, business contacts, business plans, computer software, licenses and contracts relating thereto, source codes and all documents relating thereto, all intellectual property, books and records and customers, credit reports, sales information of whatever nature which would give the other party an opportunity to obtain an advantage over the other in the marketplace excluding information that is in the public domain at the time of termination or that becomes part of the public domain from sources other than the contractor during the succeeding _____ years."

32. Pursuant to said agreement PAS working jointly with DPS began to market PAS and DPS technology to its clients and customers.

6

33. Representatives of DPS accompanied PAS principals and employees on sales calls to PAS customers, all in furtherance of the carrying out of the parties' aforesaid agreement.

34. However, DPS, commencing in or about late 2008 or early 2009, has violated the aforementioned agreement in that it has:

i) negotiated directly with parties known to DPS to be PAS customers to sell or lease PAS technology along with its own digital pen technology, completely circumventing and bypassing PAS;

ii) negotiated and entered into agreements with third parties to market its digital pen technology violating the exclusivity clause of the contract;

iii) disclosed to third parties information and technology of a confidential proprietary nature, such technology and information contemplated as confidential and proprietary under the parties' agreement;

iv) misrepresented and continues to misrepresent its relationship with PAS to third parties in the marketplace so as to cause confusion and inhibit PAS sales;

v) disparaged PAS to third parties in the marketplace so as to inhibit and damage PAS sales.

35. As a natural and intended consequence and result of all of the aforementioned breaches of contract and/or tortious interference, PAS has been damaged in the amount of $2,000,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DIGITAL PEN SYSTEMS, INC.

36. The plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 35 above as if more fully set forth herein.

37. As a result of the violations and continuing violations of DPS, as stated above, the plaintiff, PAS, continues to be damaged on a regular basis.

7

38. The defendant, DPS, continues to appropriate PAS technology, contact parties known to DPS to be PAS customers, misrepresent PAS' products and services and the status of the company, damaging PAS and damaging its sales.

39. All of the above continues on a present basis in violation of the written Agreement referred to above.

40. All of the above serves to irreparably harm the plaintiff.

41. As such, plaintiff demands a judgment against DPS permanently restraining it from violating the aforesaid Agreement by contacting customers of PAS and marketing PAS' products and services such as the digital pen technology.

42. Plaintiff has no adequate remedy at law.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST THE DEFENDANTS, MDWerks and
### DIGITAL PEN SYSTEMS, INC.

43. The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 42 above as if more fully set forth herein.

44. The defendants, MDW and DPS acting together one with the other and in concert and consultation with one another, have actively sought to interfere with, interrupt and to usurp for themselves contracts which PAS was in the process of negotiating with clients of PAS, which facts and processes were known by said defendants to be taking place.

45. The aforesaid two defendants, MDW and DPS, continue at the present time to tortiously interfere with PAS' clients and attempts to market its products in the following manner:

  i) said defendants continue to contact representatives of a nursing home organization known as Americare, known to defendants to be a client of PAS in an attempt to have contracts signed by Americare directly with MDWerks, and/or DIGITAL PEN APPLICATIONS, INC. owned by MDWorks, Inc. and/or Digital Pan Systems, Inc. completely bypassing and circumventing PAS;

8

    ii)  to attend meetings in person with representatives of Americare without the knowledge or consent of PAS for the purpose of obtaining agreements with Americare;

    iii)  to conspire together to cause DIGITAL PEN SYSTEMS, INC. to shut down service to PAS customers such as Americare, Lifestar Ambulance and Lifeco so as to cause such customers to threaten to cancel their contracts due to a lack of service and support and to shut down PAS web sites and demonstration sites.

    46.  As a direct and proximate result of such tortious interference by said defendants, with parties to and dealings with PAS contracts, the plaintiff PAS has been damaged in the amount of $2,000,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST XENI FINANCIAL SERVICES CORP.

    47.  The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 46 above as if more fully set forth herein.

    48.  The defendant, XENI FINANCIAL SERVICES CORP. (hereinafter "XENI") as aforestated, is a wholly owned subsidiary of MDW and was at all times and still is in the business of providing financing for medical receivables and to health industry providers and suppliers.

    49.  In such capacity, on or about, the time plaintiff and the defendant, MDW entered into the aforementioned Licensing and Sales Agreement, MDW through its subsidiary XENI began loaning to PAS funds to be used by PAS in the operation of its business.

    50.  Such funds were loaned to PAS by MDW through its subsidiary XENI upon terms that were so onerous and abusive so as to almost ensure a default.

    51.  Such terms include but are not limited to substantially higher than market rate interest rates, no allowances for prepayment, a prohibition on plaintiff's ability to merge, acquire, partner with or joint venture with any other business entity without XENI's

9

(MDWerks') knowledge and consent, and a prohibition on PAS' ability to raise funds from other third party sources.

52.   In addition once said loans were in place after the execution of the aforementioned Licensing and Sales Agreement, the defendant, MDWerks began to tortiously and wrongfully interfere in plaintiff's business transactions making it more and more difficult for plaintiff to meet its financial obligations, all with the unlawful intent to compel and coerce the plaintiff into defaulting in such obligations.

53.   In addition, the defendant, MDWerks, under the guise of inspecting the plaintiff's books and records pursuant to the aforesaid loan documents, sent its then chief financial officer to PAS offices over a period of time in or about mid-2009, which was an inordinately long time for completion of such review.

54.   During this period of time, the defendant, MDW, necessarily as a result of its direct access to and review of all of plaintiff's financial and account and other information, during the aforementioned "review," learned much of plaintiff's trade secrets, customer lists, technology and business practices; notwithstanding that defendant was only authorized to review certain financial-related records.

55.   The defendant, MDWerks immediately began abusing this knowledge by unfairly competing with plaintiff, rendering it impossible for plaintiff to meet its financial obligations, including in particular the payments on the plaintiff's notes owed to XENI.

56.   In sum, the defendants, MDWerks, XENI, and DIGITAL PEN APPLICATIONS, INC. intentionally and tortiously caused the plaintiff to be unable to meet its financial obligations, all as aforedescribed.

57.   As such, the plaintiff demands a judgment against the defendant, XENI, declaring its notes null and void and of no further force or effect or, in the alternative, suspending said notes and holding their compliance in abeyance pending a fact-finding on the instant claim(s).

10

### AS AND FOR A SEVENTH CAUSE OF ACTION
### AGAINST HOWARD KATZ

58.   The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 57.

59.   The defendant, HOWARD KATZ, was at one time the chief executive officer (hereinafter CEO) of the defendant, MDW.

60.   In such capacity as CEO of MDW, the defendant, HOWARD KATZ, executed the aforementioned Licensing and Sales Agreement dated August 18, 2009 with PAS.

61.   This Agreement contained all of the above-referred-to language contained in paragraph 16 of this Complaint.

62.   Thereafter, the defendant, HOWARD KATZ, resigned from his post at CEO of the defendant, MDWerks and set up a consulting firm known as Van Dam Consulting Services, Inc. to allegedly render consulting services in the medical billing field.

63.   The defendant, HOWARD KATZ, thereafter demanded as a precondition to his arranging a subsequent loan by XENI (a wholly-owned subsidiary of MDWerks to PAS, that PAS pay him as a consultant representing to PAS that he could and would render valuable consulting services to PAS in the field of its usual business.

64.   The aforesaid defendant, HOWARD KATZ, demanded at times that PAS pay to his consulting company an amount as high as $10,419.00 in one month.

65.   In return for such payment, the defendant owed plaintiff a duty of or obligation to act in plaintiff's best interests, to guard plaintiff's trade secrets and technology, and to abide by the terms of the Licensing and Sales Agreement referred to above.

66.   The defendant, HOWARD KATZ, has breached and violated his aforementioned duties and obligations to plaintiff in that he has:

      i)   interfered in the plaintiff's relationship with its vendors such as DIGITAL PEN SYSTEMS, INC.;

11

ii) interfered with the plaintiff's relationship with its customers such as Americare, Lifestar Ambulance and Lifeco;

iii) disclosed trade secrets, customers list, technology know how, confidential financial information to PAS clients and third parties;

iv) performed all of the foregoing with a malicious and nefarious intent to cause and/or allow other defendants herein to obtain a great financial and negotiational advantage over plaintiff and, ultimately, to gain control of PAS.

67: Upon information and belief, said defendant, KATZ, is and was, moreover, the driving force behind all of the breaches of duty, contract, and commission of civil wrongs against plaintiff as are pleaded herein against all defendants.

68. As a direct, natural and proximate result of all of the foregoing the plaintiff has been damaged in the amount of $2,000,000.00, and demands punitive damages against defendant KATZ in an additional amount of $10,000,000.00.

WHEREFORE, the plaintiff demands judgment as follows:

(a) on the first cause of action, judgment against the defendant, MDWerks, Inc. in the sum of $2,000,000.00;

(b) on the second cause of action, judgment against the defendant, MDWerks, Inc. permanently restraining and enjoining the defendant, MDWerks, Inc. from violating the Licensing and Servicing Agreement by competing with plaintiff by working with DIGITAL PEN SYSTEMS, INC.;

(c) on the third cause of action, judgment against the defendant, DIGITAL PEN SYSTEMS, INC. in the sum of $2,000,000.00.

(d) on the fourth cause of action, judgment against the defendant, DIGITAL PEN SYSTEMS, INC. permanently restraining and enjoining the defendant DIGITAL PEN SYSTEMS from violating its Agreement with plaintiff by working with MDWerks, INC.;

(e) on the fifth cause of action, judgment against the defendants, MDWerks, INC. and DIGITAL PEN SYSTEMS, INC. in the sum of $2,000,000.00;

12

(f)   on the sixth cause of action, judgment against the defendant, XENI FINANCIAL SERVICES, INC., declaring its notes null and void and of no other force and effect;

(g)   on the seventh cause of action, judgment against the defendant, HOWARD KATZ, in the sum of $2,000,000.00 in compensatory damages, and $10,000,000.00 in punitive damages;

all of the foregoing together with interest from the date of breach or tortious act as is proven, costs and disbursements herein, and such other and further relief which as to this Court may seem just and proper.

Dated: Mineola, NY
     March 24, 2010

                              Yours, etc.

                              DAVID H. LEDGIN
                              *Attorney for Plaintiff*
                              1539 Franklin Avenue, Suite 201
                              Mineola, NY 11501
                              516 747-1210

13



## LICENSING AND SALES AGREEMENT

This Licensing and Sales Agreement ("Agreement") is entered into as of this 18th day of August, 2008 by and between PATIENT ACCESS SOLUTIONS INC., Inc., a corporation organized and existing under the laws of the State of Nevada, having a principal place of business at 245 Marcus Blvd. Hauppauge NY 11788 (hereinafter: "PASHEALTH") and MDwerks, Inc. a corporation organized and existing under the laws of the State of Delaware, having a principal place of business located at: 1020 NW 6th Street Deerfield Beach, Florida, 33442. .(hereinafter: "Contractor").

Whereas, Contractor is desirous of becoming an Licensing Representative of PASHEALTH to License The PASHealth DPAS Digital Pen System with EMR and its related product and services, including, credit, debit, check services and

NOW THEREFORE, in consideration of the promises and the mutual covenants and agreements herein contained, it is mutually agreed by the parties hereto as follows:

1. **TERMS OF AGREEMENT**

PASHEALTH hereby appoints Contractor, during the term of this Agreement to act as an Independent Contractor to License and sell DPAS Digital Pen System products on a nonexclusive basis.  Contractor hereby accepts such appointment under the following conditions;

(a) Licensing and Sales- Contractor agrees to License DPAS Digital Pen System program to qualified healthcare providers. Sales shall be conducted in accordance with the sales policies and procedures established by PASHEALTH.

(b) Contractor warrants that DPAS Digital Pen System, a product of Patient Access Solutions Inc., is its only product in the area of healthcare digital pen technology and will represent no other similar product or service during the term of this Agreement.

2. **SUBCONTRACTORS**

Contractor shall have the right to retain the services of subcontractors without the prior consent of PASHEALTH, upon the financial terms to be agreed to between Contractor and its subcontractors. PASHEALTH is not responsible for any payments to Contractor's subcontractors whatsoever, and this fact shall be conveyed to the subcontractors in writing as part of the subcontract agreement with a copy to PASHEALTH.

(a) Contractor will supply PASHEALTH with the name, address and phone number of all subcontractors,

(b) Contractor will be responsible for all commissions payable to sub contractors.

(c) Contractor will provide PASHEALTH with a copy of all executed subcontracts within five (5) business days of the execution of each subcontract.

3.   **COMMISSIONS AND BUY RATE**

(a) Subject to Paragraphs 10 and 11, Contractor shall receive commissions at a rate of 5% of the gross dollar sales by customers who originally purchased DPAS Digital Pen System  from the Contractor or leased DPAS Digital Pen System  as a result of the Contractor's efforts. A customer will be deemed to have purchased DPAS Digital Pen System  from the Contractor or leased DPAS Digital Pen System  as a result of the Contractor's efforts if the Contractor obtains the necessary paperwork from the customer, as defined by company, duly executed and in proper form, and provides such paperwork to PASHEALTH. Contractor will be responsible to pay Contractor's Federal, State and Local taxes related to the commission's payable hereunder where applicable.

4.   **PAYMENT**

(a) All residual commissions for contracted clients/customers are considered to be earned by the contractor upon the receipt of amounts from the Customer by PASHEALTH. These commissions shall be paid on or before the 30th day of the following month after collection by PASHEALTH. No payment shall be made for such commissions unless the full amounts are collected by PASHEALTH. Payment of commissions for these services shall continue as long as Customer continues to use DPAS Digital Pen System and Contractor continues to service the Customer as defined below.

(b) Contractor acknowledges that the third party lessor, if applicable will not remit any funds to the Contractor until such time as the DPAS program has been deployed and installed and the end user properly trained.

(c) Contractor acknowledges that in the case of a lease through any leasing company, contractor will receive payment following the first ACH made and collected by leasing company. As soon as 4 ACH's have been received by leasing company then the Contractor has no charge back liability.

(d) Within 30 days of the execution of the Agreement, PASHEALTH shall deliver 1,550,000 shares of PASHEALTH common stock to the applicant as a partial of the consideration for accepting the appointment as Independent Contractor.

5.   **CONTRACTOR RESPONSIBILITIES AND DUTIES**

Contractor agrees to:

(a) Use its best efforts to License and sell DPAS Digital Pen System.

(b) Ensure that any statements or representations made by Contractor in the course of offering or licensing DPAS Digital Pen System products accurately and honestly reflect DPAS Digital Pen System products.

(c) Comply with all Federal, State and Local laws and regulations that may pertain to the sale of DPAS Digital Pen System .

(d) Give prompt notice to PASHEALTH of any infringement of any copyright, trade name, trademark, or unfair competition or trade disparagement, which comes to its attention and will render to PASHEALTH such assistance in regulating such action as it will need.

page 3 of 5

MISSING

  (i)  Amounts related to PASHealth DPAS licenses installed prior to the date of termination for which the Customer had not yet made payment.

  (ii)  Amounts related to residual commissions for service agreements that were processed prior to the date of Termination for which the Customer had not yet made payment.

  (iii)  Items (a) and (b) above for which the Customer had made payment, but the Contractor had not yet been paid by PASHEALTH.

All payments due under (i), (ii) and (iii) above shall be made in accordance with the payment schedule discussed in Paragraph 4 of this Agreement.

(b) The waiver by PASHEALTH of a breach or violation of any provision of this Agreement by the Contractor shall not operate nor be construed as a waiver of any subsequent breach or violation. The waiver by PASHEALTH to exercise any right or remedy it may possess shall not operate nor be construed as a bar to the exercise of such right or remedy by PASHEALTH upon the occurrence of any subsequent breach or violation.

**11. TERM AND TERMINATION**

  (a) Subject to Paragraph 11(b), this Agreement shall remain in effect for an initial term of three (3) years, and thereafter shall be renewed for additional periods of one-year increments if agreed to in writing by both parties.

  (b) Either party may terminate this Agreement, with or without cause, by providing ninety day (90) written notice of its intention to terminate this Agreement to the other party. If this Agreement is terminated under this provision or is not renewed after a one year period pursuant to Paragraph 11(a), the Contractor shall continue to receive all residual commission amounts for each Customer to whom it sold DPAS Digital Pen System , for as long as the Contractor continues to service such Customer.  The Contractor will not be entitled to receive such future residual commission amounts if the Agreement is terminated for Breach of Contract.

**12. ASSIGNMENT**

Contractor shall not assign this Agreement to another party without the express written consent of PASHEALTH, which consent shall be at the sole discretion of PASHEALTH.

**13. NOTICES**

Any and all notices and other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, or when delivered by United States mail, by registered or by a nationally recognized overnight delivery service, or certified mail, postage prepaid, return receipt requested, to the respective parties at the following respective addresses:

  If to PASHEALTH:  PATIENT ACCESS SOLUTIONS INC.
        245 Marcus Blvd,
        Hauppauge, NY 11791

  If to Contractor:  MDwerks Inc.
        1020 NW 6th Street
        Deerfield Beach, FL 33442



## 14. ENTIRE AGREEMENT

This Agreement constitutes the complete and exclusive statement of agreement between PASHEALTH and Contractor with respect to the subject matter herein and replaces and supercedes all prior written and oral agreements or statements by and between them relating to such subject matter. No representation, statement, condition or warranty not contained in this Agreement will be binding on the parties or have any force or effect whatsoever.

## 15. SEVERABILITY

The invalidity of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part hereof, all of which are inserted conditionally on their being valid in law. If any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall be declared invalid by any court of competent jurisdiction, then, in any such event, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted.

## 16. JURISDICTION AND VENUE

a. This Agreement shall be governed by, and shall be construed and interpreted in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

b. Any claim or dispute arising out of, connected with, or in any way related to this Agreement which results in litigation shall be exclusively instituted by the complaining party and adjudicated in either the New York State courts located in Suffolk County, New York, and each of the parties to this Agreement consent to the personal jurisdiction of and venue in such courts. In no event shall either party to this Agreement contests the jurisdiction or venue of such courts with respect to any such litigation.

c. The prevailing party in any such action shall be entitled to receive reasonable attorney's fees and related costs from the other party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by its duly authorized representatives:

AGREED AND ACCEPTED BY:

PATIENT ACCESS SOLUTIONS INC., Inc.
By: Bruce Weitzberg, its CEO

Date: August 18, 2008

MDwerks, Inc.
Howard B. Katz, its CEO

Date: August 18, 2008



### FOR IMMEDIATE RELEASE

### MDWERKS ENTERS DIGITAL PEN AND PAPER MARKETPLACE

**DEERFIELD BEACH, Fl. – March 11, 2009 – MDwerks, Inc. (OTCBB: MDWK) ("the Company"), and its wholly owned subsidiary Xeni Patient Access Solutions, Inc., ("XPAS"), announced today that the Company has entered the digital pen and paper marketplace through the sale of the proprietary "D-PAS" digital pen and the related software and services.  The Company has a nationwide sub-license agreement and a sales and marketing agreement with New York based Patient Access Solutions, Inc. ("PAS"), from whom the pens and related software and services will be attained.**

- Scope of arrangement
- Exclusivity

The D-PAS digital pen is manufactured by Anoto Group AB, an electronics and technology company based in Stockholm, and is used to electronically complete certain patient forms using digital paper and captures all the data with miniature camera lenses and transfers this information to an assigned computer via Bluetooth connected to a cell phone or through a direct computer connection upon placing the pen back in its docking station.  Thus, all patient information can be secured in the computer system, backed up to a server and transferred to any doctor's office or health care facility instantly. This digital pen can store up to 200 pages of data at any one time, has a long battery life, is durable and automatically charges when in the docking station.

MDwerks is selling a package which includes the D-PAS digital pen, along with software customized and implemented into each client's individual system. The package will initially be leased for 36 and 48 month periods to health care facilities, such as nursing homes, at approximate prices ranging from $100,000 to over $1,000,000 for large installations. In February 2009, XPAS opened a sales office in Deerfield Beach, Florida consisting of five (5) professionals, and intends to expand to five other states with a heavy concentration in home health care and nursing homes. (HBK / consult / larger sales)  Since November 2008, XPAS has provided financing for leasing transactions of the digital pen and related software sold by PAS to nursing homes in both New York and New Jersey.

David M. Barnes, President and CEO, commented, "With a continuing shift from traditional paper to electronic medical records, we believe that the D-PAS digital pen will become an increasingly attractive and necessary product in the health care industry. In addition to home health care, we expect to provide efficient digital solutions to related industries such as clinical trial operations, hospitals, and independent physician practices in the coming months as well as introducing these digital solutions to other industries such as aviation, trucking and transportation. We look forward to keeping shareholders and potential investors apprised of our progress."

The Company also announced that it has ceased all prior operations involving billing and collection services.  However, MDwerks will continue to provide financing to certain client companies for factoring of accounts receivable, inventory and other assets as well as for leasing arrangements having to do with digital pen and paper as well as the associated software integration and installation services.

**About MDwerks, Inc.**

EX. B

EX. B

MDwerks, Inc.                                                                Page 2
March ___, 2009

MDwerks, Inc., (OTCBB: MDWK) is based in Deerfield Beach, Florida.  For more information about the
Company, please visit www.mdwerks.com and PAShealth.com.  (Need digital info on the MDWK web
site).

*Certain statements in this news release may contain forward-looking information within the meaning of
Rule 175 under the Securities Act of 1933 and Rule 3b-6 under the Securities Exchange Act of 1934,
and are subject to the safe harbor created by those rules. All statements, other than statements of fact,
included in this release, including, without limitation, statements regarding potential future plans and
objectives of the companies, are forward-looking statements that involve risks and uncertainties. There
can be no assurance that such statements will prove to be accurate and actual results and future events
could differ materially from those anticipated in such statements. Factors that could cause actual results
to differ materially from those in the forward-looking statements include, among other things, the
following: general economic and business conditions; competition; unexpected changes in technologies
and technological advances; ability to commercialize and manufacture products; results of experimental
studies; research and development activities; changes in, or failure to comply with, governmental
regulations; and the ability to obtain adequate financing in the future. This information is qualified in its
entirety by cautionary statements and risk factors disclosure contained in certain of MDwerks' Securities
and Exchange Commission filings available at http://www.sec.gov.*

<u>**CONTACT:**</u>                            -or-          <u>**INVESTOR RELATIONS COUNSEL:**</u>
MDwerks, Inc., Deerfield Beach, Florida                    The Equity Group Inc., New York, NY
David Barnes                                              Adam Prior
Chief Executive Officer                                   (212) 836-9606
954-389-6300                                             aprior@equityny.com
dbarnes@mdwerks.com                                      www.theequitygroup.com



### FOR IMMEDIATE RELEASE

### MDWERKS ENTERS DIGITAL PEN AND PAPER MARKETPLACE

DEERFIELD BEACH, FL – March 11, 2009 – MDwerks, Inc. (OTCBB: MDWK) ("the Company"), and its wholly owned subsidiary Xeni Patient Access Solutions, Inc., ("XPAS"), announced today that the Company has entered the digital pen and paper marketplace through the sale of the proprietary "D-PAS" digital pen and the related software and services.  The Company has a nationwide sub-license agreement and a sales and marketing agreement with New York based Patient Access Solutions, Inc. ("PAS"), from whom the pens and related software and services will be attained.

- Scope of arrangement
- Exclusivity

The D-PAS digital pen is manufactured by Anoto Group AB, an electronics and technology company based in Stockholm, and is used to electronically complete certain patient forms using digital paper and captures all the data with miniature camera lenses and transfers this information to an assigned computer via Bluetooth connected to a cell phone or through a direct computer connection upon placing the pen back in its docking station.  Thus, all patient information can be secured in the computer system, backed up to a server and transferred to any doctor's office or health care facility instantly. This digital pen can store up to 200 pages of data at any one time, has a long battery life, is durable and automatically charges when in the docking station.

MDwerks is selling a package which includes the D-PAS digital pen, along with software customized and implemented into each client's individual system. The package will initially be leased for 36 and 48 month periods to health care facilities, such as nursing homes, at approximate prices ranging from $100,000 to over $1,000,000 for large installations. In February 2009, XPAS opened a sales office in Deerfield Beach, Florida consisting of five (5) professionals, and intends to expand to five other states with a heavy concentration in home health care and nursing homes. (HBK / consult / larger sales)  Since November 2008, XPAS has provided financing for leasing transactions of the digital pen and related software sold by PAS to nursing homes in both New York and New Jersey.

David M. Barnes, President and CEO, commented, "With a continuing shift from traditional paper to electronic medical records, we believe that the D-PAS digital pen will become an increasingly attractive and necessary product in the health care industry. In addition to home health care, we expect to provide efficient digital solutions to related industries such as clinical trial operations, hospitals, and independent physician practices in the coming months as well as introducing these digital solutions to other industries such as aviation, trucking and transportation. We look forward to keeping shareholders and potential investors apprised of our progress."

The Company also announced that it has ceased all prior operations involving billing and collection services.  However, MDwerks will continue to provide financing to certain client companies for factoring of accounts receivable, inventory and other assets as well as for leasing arrangements having to do with digital pen and paper as well as the associated software integration and installation services.

About MDwerks, Inc.

Barnes Declaration
EX. B

EX. B

MDwerks, Inc.                                                                                          Page 2
March ___, 2009

MDwerks, Inc., (OTCBB: MDWK) is based in Deerfield Beach, Florida. For more information about the Company, please visit www.mdwerks.com and PAShealth.com. (Need digital info on the MDWK web site).

*Certain statements in this news release may contain forward-looking information within the meaning of Rule 175 under the Securities Act of 1933 and Rule 3b-6 under the Securities Exchange Act of 1934, and are subject to the safe harbor created by those rules. All statements, other than statements of fact, included in this release, including, without limitation, statements regarding potential future plans and objectives of the companies, are forward-looking statements that involve risks and uncertainties. There can be no assurance that such statements will prove to be accurate and actual results and future events could differ materially from those anticipated in such statements. Factors that could cause actual results to differ materially from those in the forward-looking statements include, among other things, the following: general economic and business conditions; competition; unexpected changes in technologies and technological advances; ability to commercialize and manufacture products; results of experimental studies; research and development activities; changes in, or failure to comply with, governmental regulations; and the ability to obtain adequate financing in the future. This information is qualified in its entirety by cautionary statements and risk factors disclosure contained in certain of MDwerks' Securities and Exchange Commission filings available at http://www.sec.gov.*

| | | |
|---|---|---|
| **CONTACT:** | -or- | **INVESTOR RELATIONS COUNSEL:** |
| MDwerks, Inc., Deerfield Beach, Florida | | The Equity Group Inc., New York, NY |
| David Barnes | | Adam Prior |
| Chief Executive Officer | | (212) 836-9606 |
| 954-389-8300 | | aprior@equityny.com |
| dbarnes@mdwerks.com | | www.theequitygroup.com |

Agreement made this 𝒟 day of September, 2008, by and between Patient Access Solutions, Inc. (hereinafter "PAS"), a corporation having its principal place of business at 245 Marcus Blvd., Hauppauge, New York, 11788 and Digital Pen Systems, Inc. (hereinafter "DPS"), a corporation having its principal place of business at 155 South 300 West, Suite 206, Salt Lake City, Utah, 84401.

WHEREAS, PAS is in the business of providing to health car providers and hospitals point of service terminals and web portals to be used to verify patient eligibility, process claims, verify health insurance coverage and accept credit card payments, and

WHEREAS, PAS is also engaged in the business of providing to health care providers and hospitals digital pen and paper technologies to allow such health care providers and hospitals to capture patient information, process same, and maintain electronically such patient information, and

WHEREAS, PAS also provides to non-health care customers through its subsidiary Digital Paperwork Access Solutions, Inc. (DPAS) digital pen and paper technologies to allow such customers to capture, process and preserve such information as they deem necessary, and

WHEREAS, DPS is in the business of developing, and has developed, the aforesaid digital pen and paper technology, and

WHEREAS, PAS and DPS wish to enter into a joint venture wherein and whereby they will work together to market, sell or lease to health care providers their technology or to non health care providers through DPAS;

NOW, THERFORE, for and in consideration of the mutual covenants and conditions contained herein, and for other good and valuable consideration, the parties hereto agree as follows:

1. PAS and DPS will jointly market their respective technologies to health care providers and hospitals and non-health care providers, on an exclusive basis. PAS and DPS will cooperate with each other to integrate their respective technologies so as to be able to market to potential clients a complete package to satisfy all their requirements.

2. Each of the respective parties herein shall retain ownership of its respective technology during and after the term of this Agreement. All customer lists generated by PAS, or customers produced or contracted by PAS, shall remain the property of PAS. PAS shall have the primary responsibility to contact such customers and to market the joint products and services produced by this Agreement. Nothing herein shall be deemed to transfer any ownership rights in the respective technologies of the parties herein.

Ex C

Ex. C.

3. Compensations earned and payable hereunder shall be determined by both parties under separate addendum

4. The parties hereto agree as follows:

a) use their best efforts to market and sell the joint ventures, products and services.

b) ensure that any statements or representations make by each in the course of offering or marketing the products accurately and honestly reflect such products.

c) provide proper on-going support to the representatives of all end users to whom the products have been sold or leased. (A sale includes whether the products are sold directly to the customer or is processed through a lease with the contractor or any third party)  Support shall include assisting end users to resolve problems or questions regarding the operation of the system (but not with the collection of money for claims submitted through the System) and to provide additional training of end user personnel as requested by the customer or as deemed necessary by either party hereto.

d) make all representatives available for complete setting up of the products at the customers designated sites.

e) comply will all Federal, State and Local laws and regulations that may pertain to the sale or lease of the products and systems.

f) give prompt notice to each other of any infringement of any copyright, trade name, trademark, or unfair competition or trade disparagement, which comes to their attention and will render to each other assistance in restraining such disparagement.

5. During the term of this contract and for a period of 5 years after the termination of this Agreement, the parties agree not to disclose or use for their own benefit or for the benefit of any third party any confidential information disclosed to it by each other.  This shall include, but not be limited to, products, models, designs, equipment, pricing policies, marketing strategies, business contacts, business plans, computer software, licenses and contracts relating there to, source codes and all documents relating there to, all intellectual property, books and records and customers, credit reports, sales information of whatever nature which would give the other party an opportunity to obtain an advantage over the other in the marketplace excluding information that is in the public domain at the time of termination or that becomes part of the public domain from sources other than the contractor during the succeeding ___ years.

6. The term of this Agreement shall be for five (5) years.  The Agreement shall be automatically renewed for additional one year periods unless each party gives notice to the other of its intention to not renew such Agreement.

7. This agreement may be terminated for cause by either party hereto in the event either party breaches any of its obligations, responsibilities or duties under this Agreement. The breaching party shall have 30 days to cure such breach after receiving notification of same. In the event such breach is not cured, then this Agreement shall be deemed null and void and of no other force or effect. However, any fees, commissions, payments, royalties or such other compensation as may be due after termination due to sales or leases placed prior to termination shall continue to accrue and be due and payable to the respective party.

8. This agreement shall be binding upon each party's assigns, successor-in-interest, or any other third party which may acquire or merge with one of the parties hereto.

9. Any and all notices and other communication required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, or when delivered by United States mail, by registered or by a nationally recognized overnight delivery service, or certified mail, postage prepaid, return receipt requested, to the respective parties at the following respective addresses:

    if to PAS    Patient Access Solutions, Inc.
                245 Marcus Blvd.
                Hauppauge, NY 11788

    if to DPS    Digital Pen Systems, Inc.

10. This agreement constitutes the complete and exclusive statement of agreement between the parties with respect to the subject matter herein and replaces and supercedes all prior written and oral agreements or statements by and between them relating to such subject matter. No representation, statement, condition or warranty not contained in this Agreement will be binding on the parties or have any force or effect whatsoever.

11. The invalidity of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part hereof, all of which are inserted conditionally on this being valid in law. If any one or more of the words, phrases, sentences clauses or sections contained in this Agreement shall be declared invalid by any court of competent jurisdiction, then, in any such event, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted.

12. Jurisdiction and Venue:

    a) this Agreement shall be governed by, and shall be construed and

p.6

interpreted in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

b) any claim or dispute arising out of, connected with, or in any way related to this Agreement which results in litigation shall be exclusively instituted by the complaining party and adjudicated in either the New York State courts located in Suffolk County, New York, and each of the parties to this Agreement consent to the personal jurisdiction of and venue in such courts. In no event shall either party to this Agreement contests the jurisdiction or venue of such courts with respect to any such litigation.

c) the prevailing party in any such action shall be entitled to receive reasonable attorney's fees and related costs form the other party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by its duly authorized representatives:

AGREED AND ACCEPTED BY:

Patient Access Solutions, Inc.

by: Bruce Weitzberg

Digital Pen Systems, Inc.

by: Jason Soulier

B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

PATIENT ACCESS SOLUTIONS, INC.,

Plaintiff,

vs.                                                      **Index No. 10-08325**

MDWERKS, INC., XENI FINANCIAL SERVICES,
CORP., DIGITAL PEN APPLICATIONS, INC.,
DIGITAL PEN SYSTEMS, INC. and HOWARD
KATZ,

Defendants.

## NOTICE OF FILING OF NOTICE OF REMOVAL

To:    The Supreme Court of the State of New York County of Suffolk
       Clerk's Office/Riverhead
       One Court Street
       Riverhead, New York 11901

Please take notice that pursuant to 28 U.S.C. §§ 1332 and 1441(b) and Local Civil Rule 81.1, defendants MDwerks, Inc., Xeni Financial Services, Corp., Digital Pen Applications, Inc., and Howard Katz did, on the 11th day of June, 2010, file a Notice of Removal in the United States District Court for the Eastern District of New York, a copy of which is attached hereto, and that said matter shall proceed hereafter in the United States District Court for the Eastern District of New York.

Dated: June 11, 2010

McCullough Ginsberg Montano & Partners LLP

Ted McCullough (No. 7609)
320 East 53rd Street, Suite 100
New York, New York 10022
Phone (646) 747-4677
Facsimile (646) 349-2217
tmccullough@mgpllp.com

*Attorneys for Defendants MDwerks, Inc., Xeni*
*Financial Services, Corp., Digital Pen Applications,*
*Inc., and Howard Katz*

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                            ) ss:
COUNTY OF NEW YORK  )

       Timothy Long, being duly sworn, deposes and says: that he is not a party to the action, is over 18 years of age and reside in the County of Kings, New York.

       That on the 11th day of June, 2010, the deponent served the within **NOTICE OF REMOVAL** upon:

David H. Ledgin, Esq.
Attorney of Record for Plaintiff
1539 Franklin Avenue, Suite 201
Mineola, New York 11501

by depositing a true copy of same securely enclosed in a postpaid properly addressed wrapper, in an official depository under the exclusive care and custody of Federal Express for overnight delivery service.


                                          Timothy Long


Sworn to before me, this
11th day of June, 2010

Notary Public


**LISA M LARKIN**
**NOTARY PUBLIC-STATE OF NEW YORK**
**No. 01LA6153595**
**Qualified in Queens County**
**My Commission Expires October 10, 2010**
